## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LINDA ALLARD and KELLY STRACHE**, individually and on behalf of all others similarly situated, | Civil Case No.: 17-cv-4692 |
| Plaintiffs, | |
| v. | |
| **SCI Direct, Inc. d/b/a Neptune Society** | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 2

    A.   Plaintiffs' Allegations ................................................................................ 2

    B.   Procedural History ..................................................................................... 3

    C.   Discovery and Motion Practice ................................................................. 4

    D.   Mediation .................................................................................................. 4

    E.   The Settlement ........................................................................................... 5

On September 29, 2017, Plaintiffs filed an unopposed Motion for Preliminary Approval of the proposed Settlement. The Court preliminary approved the proposed Settlement on October 11, 2017. The Settlement is detailed below. ......................................... 5

    1.   Defined Classes ............................................................................... 5

    2.   Monetary Relief .............................................................................. 5

    3.   Redistribution and Cy Pres ............................................................ 6

    4.   Prospective Relief ........................................................................... 7

    5.   Release ............................................................................................ 7

    6.   Service Awards ............................................................................... 8

    7.   Attorneys' Fees and Costs .............................................................. 9

    8.   Administration and Notice .............................................................. 9

III.    DISCUSSION ................................................................................................... 10

    A.   Legal Standard for Approval .................................................................. 10

    B.   The Settlement is the Product of Arm's Length Negotiations. ........................... 11

    C.   The Settlement is Fair, Reasonable, and Adequate. ............................................ 11

    1.   The Settlement Provides Substantial Relief, Particularly in Light of the Uncertainty of the Prevailing on the Merits and any Damages Award. .......................... 11

i

2.    Continued Litigation is Not in the Best Interests of Plaintiffs or Members of the Classes. ........................................................................................................ 15

3.    The Response to the Settlement is Overwhelmingly Positive, and There Have Been No Objections. ................................................................................................ 16

4.    Class Counsel Endorses the Settlement. ........................................................ 17

5.    Stage of the Proceedings and Amount of Discovery Completed. ................. 17

IV.    CONCLUSION ........................................................................................................ 17

## Table of Authorities

**Cases**

*Boggess v. Hogan*
410 F. Supp. 433 (N.D. Ill. 1975) ........................................................................ 10

*Charvat v. NMP, LLC*
2012 U.S. Dist. LEXIS 139505 (S.D. Ohio Sept. 27, 2012) ................................. 12

*Christopher Legg et al. v. PTZ Insurance Agency LTD, et al.*
Case No. 14-C-10043 (N.D. Ill. Aug. 15, 2017) ................................................... 14

*City of Detroit v. Grinnell*
495 F.2d 448 (2d Cir. 1974) ................................................................................... 12

*Gehrich v. Chase Bank USA, N.A.*
316 F.R.D. 215 (N.D. Ill. 2016) ............................................................................ 12

*Golan v. Veritas Entm't, LLC*
2017 U.S. Dist. LEXIS 144501 (E.D. Mo. Sept. 7, 2017) .................................... 14

*Isby v. Bayh*
75 F.3d 1191 (7th Cir. 1996) .................................................................................. 10

*Malta v. Fed. Home Loan Mortg. Corp.*
2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) ....................................... 12

*Ossola et al. v. American Express Company, et al.*
Case No. 13-cv-4836 (N.D. Ill.) ............................................................................ 12

*Redman v. Radioshack Corp.*
2014 U.S. Dist. LEXIS 15880 (N.D. Ill. Feb. 7, 2014) ........................................ 11

*Schulte v. Fifth Third Bank*
805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................................... 16

*Spokeo, Inc. v. Robins*
136 S. Ct. 1540 (2016) ........................................................................................... 14

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*
463 F.3d 646 (7th Cir. 2006) ................................................................................. 10

*Wright v. Nationstar Mortg. LLC*
2016 U.S. Dist. LEXIS 115729 (N.D. Ill. Aug. 29, 2016) .................................... 12

**Statutes**

iii

47 U.S.C. § 227(b) .................................................................................................... 1, 2

47 U.S.C. § 227(c) ................................................................................................ 1, 3, 12

47 U.S.C. § 227(c)(5)(B) .............................................................................................. 12

**Rules**

Fed. R. Civ. P. 23(e)(1)(C) ........................................................................................... 10

**Treatises**

H. Newberg, A. Conte, Newberg on Class Actions, § 11.41 (4th ed. 2002) ................................ 10

## I.    INTRODUCTION

Plaintiffs Linda Allard and Kelly Strache ("Allard" or "Strache" separately; "Plaintiffs" collectively) respectfully move the Court for final approval of the class action settlement ("Settlement") reached between Plaintiffs and Defendant SCI Direct, Inc. d/b/a Neptune Society ("Defendant" or "SCI"). Exhibit A. As discussed in more detail below, this litigation arose from Plaintiffs' allegations that Defendant 1) made prerecorded telemarketing calls without prior express consent, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b) and 2) made telemarketing calls without implementing a written do-not-call policy or training its agents and employees on any do-not-call policy, also in violation of the TCPA, 47 U.S.C. § 227(c). Plaintiffs sought relief for two classes of persons affected by these alleged practices. The Settlement resolves all class claims in this matter.

Under the Settlement, SCI has paid to pay $15,000,000 into a settlement fund ("Fund") for Classes consisting of approximately 800,971 persons. Eligible claimants will receive a *pro rata* payment from this Fund, to be sent within sixty (60) days. No money will revert to SCI. SCI has also agreed to take certain meaningful steps to address its TCPA compliance practices.

The Court preliminarily approved the proposed Settlement on October 11, 2017. Per the Court-approved notice plan, notice was sent to 800,971 Class Members, 702,064 by direct mail and 560,018 by email.[1] Exhibit B, Declaration of H. Jacob Hack on Behalf of Settlement Administrator ("KCC Decl."), ¶ 7. On December 22, 2017, supplemental notice was sent to Class Members, reminding Class Members of the deadline and explaining the options for filing a claim. *Id.* at ¶ 11.

---

[1] Some Members were sent both email and direct mail, and some only received one or the other.

Members were given four options to file claims: using a postage-paid detachable claim post-card, using a claim form which could be printed (or requested) and mailed back, through the Settlement website, and via telephone. Of the 800,971 Class Members, 91,763 have filed claims, which is an exceptional claims rate of 11.46%. Accordingly, claiming Class Members will receive approximately $97.53 after administrative costs and requested attorneys' fees, costs, and service awards. Only 39 Class Members timely requested exclusion (0.0049%), and no Class Members objected. *Id.* at ¶¶ 12, 14. These numbers show that the notice plan and claims process were efficient and effective, and that the Settlement was well-received by Class Members.

## II.  BACKGROUND

### A.  Plaintiffs' Allegations

Plaintiff Allard alleges that in about February 2013, she provided Defendant with her cellular telephone number on a mailer card. Plaintiff Allard alleges that shortly thereafter, Defendant began placing telemarketing calls to Plaintiff Allard's cellular telephone advertising Defendant's services. Some of these calls were prerecorded. Plaintiff Allard alleges that she never provided consent for such prerecorded or autodialed calls because neither the mailer card on which she provided her phone number nor any of Defendant's other materials through which it solicited phone numbers disclosed the possibility that Defendant would place calls using an automatic telephone dialing system or prerecorded voice. Accordingly, Plaintiff alleges that Defendant's prerecorded telemarketing calls violated 47 U.S.C. § 227(b).

Furthermore, Plaintiff Allard alleges that she asked Defendant on multiple occasions to stop calling. Plaintiff Allard alleges that she did so orally on several of the calls they made, via calling Defendant and leaving a "do not call" message, via a complaint to the Better Business Bureau, and via email. Plaintiff Allard alleges that none of these efforts were successful and she

2

continued to receive calls. Plaintiff Allard alleges that Defendant failed to honor these requests because Defendant did not have a written do-not-call policy and did not train its employees on honoring do-not-call requests, as required by 47 U.S.C. § 227(c).

Plaintiff Strache does not allege a 227(b) claim but does allege a 227(c) claim substantially similar to Plaintiff Allard's. Plaintiff Strache alleges that Defendant placed dozens of telephone calls to her to try to sell its cremation services. Plaintiff Strache further alleges that she asked Defendant to stop but it did not. Plaintiff Strache alleges that Defendant violated the TCPA by making telemarketing calls prior to implementing a written "do not call" policy or training its employees on the existence and use of the "do not call" list.

### B.  Procedural History

Plaintiff Allard filed her complaint in the Middle District of Tennessee on May 27, 2016, alleging that Defendant placed prerecorded telemarketing calls to her without prior express written consent, and that Defendant also placed telemarketing calls to persons on the national do-not-call list (the "Allard Action").[2] The case was assigned to the Honorable Kevin H. Sharp. On November 28, 2016, Plaintiff Allard filed an Amended Complaint removing her claim for calling persons on the national "Do Not Call" list but adding a claim that Defendant failed to maintain a written do not call policy or train its employees on any internal "do not call" list. Shortly thereafter, on January 26, 2017, Judge Sharp resigned, effective April 15, 2017. At that point, the judicial situation in the Middle District of Tennessee became dire, with only two remaining active judges and a heavy case load. As a result of this judicial emergency, on April 11, 2017, the Allard Action was transferred to the Honorable Gershwin A. Drain of the Eastern District of Michigan, sitting by designation. On May 25, 2017, Plaintiff Strache filed her complaint in the

---

[2] *Linda Allard v. SCI Direct, Inc. d/b/a Neptune Society*, Case No. 16-cv-1033.

Circuit Court of Cook County, Illinois alleging that Defendant made calls to her and others similarly situated despite not having a written "do not call" policy or training its employees on any internal "do not call" list (the "Strache Matter"). The Strache Matter was removed to this Court on June 22, 2017.[3] The Parties agreed to stay the Strache Matter pending the resolution of Plaintiff Allard's Motion for Class Certification and Defendant's Motion for Summary Judgment, which were then pending in the Allard Matter.

### C.  Discovery and Motion Practice

Discovery began in the Allard Matter in July 2016. From then until settlement, Plaintiffs served and received responses to five sets of requests for production, four sets of interrogatories, and three sets of requests for admission. Defendant served written discovery on Plaintiff Allard and took Plaintiff Allard's deposition. Discovery was set to conclude on October 10, 2017, and trial was set to begin on February 6, 2018. On January 31, 2017, Defendant moved for summary judgment on Plaintiff Allard's individual claims. Plaintiff opposed and Defendant replied. On May 5, 2017, Plaintiff Allard filed her Motion for Class Certification. Defendant opposed and Plaintiff replied. Defendant sought leave to file a sur-reply to Plaintiff's Motion for Class Certification, which Plaintiff opposed, and the Court denied. On July 10, 2017, the Court denied Defendant's Motion for Summary Judgment. On July 31, 2017, the Court granted Plaintiff's Motion for Class Certification.

### D.  Mediation

While the aforementioned motions were pending, the Parties agreed to participate in a private mediation with the Honorable Wayne R. Andersen (ret.) of JAMS, conducted on August

---

[3] *Kelly Strache v. SCI Direct, Inc. d/b/a Neptune Society*, Case No. 17-cv-4692 (currently the operative docket in this now consolidated matter).

1, 2017 (the "Mediation"). While the Mediation did not resolve the case, it opened a constructive dialogue between the Parties. A few weeks after the mediation, the Parties reached an agreement. The agreement, as set forth in more detail below, calls for a $15,000,000 non-reversionary settlement fund and requires Defendant to take certain proactive steps to ensure its calling practices comply with the mandates of the law.

### E.  The Settlement

On September 29, 2017, Plaintiffs filed an unopposed Motion for Preliminary Approval of the proposed Settlement. The Court preliminary approved the proposed Settlement on October 11, 2017. The Settlement is detailed below.

### 1.  Defined Classes

The two settlement classes[4] are defined as follows:

- **Prerecord Class:** Since October 16, 2013, Plaintiff and all persons within the United States to whose telephone number Defendant SCI Direct, Inc. placed a telephone call using CallFire, Inc.'s calling platform when that call was dispositioned as "Answering Machine," "Live Answer," or "Do Not Call."

- **DNC Class**: Since May 27, 2012, Plaintiff and all persons within the United States to whose telephone number Defendant SCI Direct, Inc. placed (or had placed on its behalf) two or more telephone calls in a 12-month period.

Settlement Agreement § 1.30. These Classes cover 800,971 persons. Most, if not all, of the members of the Prerecord Class are also members of the DNC Class.

### 2.  Monetary Relief

---

[4] Excluded from the Settlement Classes are: (1) the Judges presiding over the Actions and members of their families; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, and employees; (3) Persons who properly execute and file a timely request for exclusion from the Settlement Class; (4) all Persons whose claims against the Defendant have been fully and finally adjudicated and/or released; and (5) the legal representatives, successors or assigns of any such excluded Persons.

The Settlement Agreement requires Defendant to create a non-reversionary fund of $15,000,000. Settlement Agreement § 1.33. This fund will be used to provide cash awards to eligible claimants who file an Approved Claim, as well as cover all administrative costs and attorneys' fees and attorneys' costs. *Id.* Each claimant who files an Approved Claim will receive a *pro rata* amount based on the number of other Approved Claims. *Id.* § 2.1(c).

To submit a claim, members of the Classes filled out and submit a claim form. Class Members were able to submit such claims electronically, via a toll-free telephone number, or via mail, including through a postage-paid claims form to be included with the notice. *Id.* §§ 5.1(a). Checks will be mailed to those submitting Approved Claims within 60 days of the Effective Date.[5] *Id.* § 2.1(d). These checks will be valid for 180 days. *Id.* § 2.1(e).

Based on the current number of claims, Class Members will receive approximately $97.53 each after deducting requested fees, costs, and incentive awards.

### 3. Redistribution and Cy Pres

Should checks exceeding $200,000 (net after expected costs) remain uncashed, this remaining amount will be distributed to those who previously filed an Approved Claim (and cashed their check) and those whose claim would have been an Approved Claim but for the fact it was untimely. *Id.* § 2.1(g). Should there be less than $200,000, the amount will be distributed

---

[5] "Effective Date" means one business day following the later of: (i) the date upon which the time expires for filing or noticing any appeal of the Final Judgment; (ii) if there is an appeal or appeals, other than an appeal or appeals solely with respect to attorneys' fees and reimbursement of expenses, the date of completion, in a manner that finally affirms and leaves in place the Final Judgment without any material modification, of all proceedings arising out of the appeal(s) (including, but not limited to, the expiration of all deadlines for motions for reconsideration or petitions for review and/or certiorari, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal(s) following decisions on remand); or (iii) the date of final dismissal of any appeal or the final dismissal of any proceeding on certiorari with respect to the Final Judgment. *Id.* § 1.11.

*cy pres* to the National Consumer Law Center, or another recipient approved by the Court. *Id.* No amount will revert to Defendant under any circumstances. *Id.* It is unknown at this time whether any such redistribution will be necessary.

### 4. Prospective Relief

In addition to the monetary relief outlined above, Defendant has agreed to create and implement a written internal do-not-call policy and to train all of its agents, employees, and independent contractors responsible for making calls to prospective customers on this policy. *Id.* § 2.2. Defendant has further agreed to implement other policies necessary to ensure compliance with 47 C.F.R. § 64-1200(d)(1)-(6). *Id.* Finally, Defendant has agreed to designate all contacts marked in its lead database as "CALL – DECEASED" as "do not call". Defendant has agreed to maintain these policies and procedures for at least two years. *Id.*

### 5. Release

Upon the Effective Date, Members who do not opt out will be deemed to have released, and by operation of the Final Judgment shall have, fully, finally, and forever, released, relinquished and discharged all Released Claims[6] against each of the Released Parties.[7] *Id.* § 3.2.

---

[6] Defined as "any and all claims or causes of action of every kind and description (including any causes of action in law, claims in equity, complaints, suits or petitions) and any allegations of wrongdoing (including any assertions of liability, debts, legal duties, torts, unfair or deceptive practices, statutory violations, contracts, agreements, obligations, promises, promissory estoppel, detrimental reliance, or unjust enrichment) and any demands for legal, equitable or administrative relief (including any claims for injunction, rescission, reformation, restitution, disgorgement, constructive trust, compensatory damages, consequential damages, penalties, exemplary damages, punitive damages, attorneys' fees, costs, interest, or expenses) that the Releasing Parties had or have (including assigned claims and "Unknown Claims" as defined herein) that have been or could have been asserted in the Actions or in any other action or proceeding before any court, arbitrator(s), tribunal or administrative body (including any state, local or federal regulatory body), regardless of whether the claims or causes of action are based on federal, state, or local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether they are known or unknown, foreseen or unforeseen, suspected

7

The Releasing Parties further agree that they will not institute any action or cause of action (in law, in equity or administratively), suits, debts, heirs or claims, known or unknown, fixed or contingent, which they may have or claim to have, in state or federal court, in arbitration, or with any state, federal or local government agency or with any administrative or advisory body, arising from or reasonably related to the allegations set forth in the Action. *Id.* This release incorporates the modification the Court ordered in its October 18, 2017 Order Granting Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement.

### 6. Service Awards

The Settlement calls for a maximum $10,000 service award to each of the named Plaintiffs. *Id.* § 8.1. Subsequently, however, and as detailed in Plaintiffs' Motion and Supporting Memorandum for Attorneys' Fees, Costs, and Services Awards ("Fee Petition"), the Court preliminarily approved an award of $10,000 to Plaintiff Allard and $7,000 to Plaintiff Strache. These awards will be paid out of the Settlement Fund. *Id.* The Settlement is not conditioned on the Court awarding the requested service award (or any service award). *Id.*

---

or unsuspected, or fixed or contingent, arising out of, or related or connected in any way with any and all telephone calls made by or on behalf of SCI to consumers and all claims or causes of action of every kind and description that were brought, alleged, argued, raised, or asserted in any pleading or court filing in the Actions, including but not limited to any such claim or cause of action under the TCPA or any similar state laws. Nothing herein is intended to release any claims any governmental agency or governmental actor has against Defendant or the Released Parties." *Id.* § 1.24.

[7] Defined as Defendant and any and all of its present or former heirs, executors, estates, administrators, predecessors, successors, assigns, parents, subsidiaries, associates, affiliated and related entities, employers, employees, agents, representatives, consultants, independent contractors, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, investment bankers, insurers, underwriters, shareholders, lenders, auditors, investment advisors, and any and all present and former companies, firms, trusts, corporations, officers, directors, other individuals or entities in which SCI has a controlling interest or which is affiliated with any of them, or any other representatives of any of these Persons and entities. *Id.* at 1.25.

8

### 7.  Attorneys' Fees and Costs

On December 6, 2017, Class Counsel filed a fee petition seeking $5,000,000 in fees and $15,539.74 in costs, for a total of $5,015,539.74. [Dkt. 28.] As detailed therein, these requested amounts are in line with the precedent in the Seventh Circuit and appropriate to compensate Class Counsel for achieving the exceptional relief described herein. On December 19, Class Counsel voluntarily agreed to subtract from his fee request the costs of giving supplemental notice to the class. While this supplemental notice was likely not necessary, Class Counsel nonetheless believed it to be the right thing to do, particularly given the general demographic of Class Members. The cost of the supplemental notice was $97,560.29. Accordingly, Plaintiffs request that the Court award $4,917,979.45 in costs and fees.

### 8.  Administration and Notice

The Claims Administrator is Kurtzman Carson Consultants ("KCC"). *Id.* § 1.28. All costs of notice and administration shall be paid from the Settlement Fund. *Id.* § 1.33. KCC has, and continues to, administer the Settlement, which included/includes, but is not limited to, performing lookups to ascertain the identities of certain members of the Classes, processing claims, disseminating notice, maintaining records, providing reports to Class Counsel and Defendant's counsel, creating the settlement website, establishing and maintaining the toll-free telephone number, and issuing all settlement payments contemplated herein. KCC has used, and continues to use as necessary, reasonable commercial services to determine names and mailing addresses of Class Members and provided notice to Class Members who can be identified and located.

KCC also aided Defendant in providing the notice required under 28 U.S.C. § 1715. This

notice was disseminated as required by the statute, and completed on October 19, 2017.[8]

## III.   DISCUSSION

### A.  Legal Standard for Approval

"A district court may approve a settlement only if it is 'fair, reasonable, and adequate.'" *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006) (citing Fed. R. Civ. P. 23(e)(1)(C). When the proposed settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced", there is a general presumption of fairness. H. Newberg, A. Conte, Newberg on Class Actions, § 11.41 (4th ed. 2002); *Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975). Nevertheless, even where there have been arm's-length negotiations, courts must independently scrutinize the fairness, reasonableness, and adequacy of the proposed Settlement. Specifically, "a district court must consider 'the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.'" *Synfuel Techs., Inc.*, 463 F.3d at 653 (citing *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996). The first factor – the strength of the plaintiff's case balanced against the amount offered in the settlement – is the most important. *Id.* These factors should be considered in the light most favorable to the settlement. *Redman v. Radioshack Corp.*, Case No. 11-cv-67141,

---

[8] Pursuant to 28 U.S.C. § 1715, a Court may not grant final approval to a proposed settlement "earlier than 90 days" after notice was completed. Whether construed from the date of the last delivery – November 2, 2017 – or the date notice was sent – October 19, 2017 – final approval is sought more than 90 days after the required notice was given.

2014 U.S. Dist. LEXIS 15880, *9 (N.D. Ill. Feb. 7, 2014).

### B. <u>The Settlement is the Product of Arm's Length Negotiations.</u>

The Settlement herein was reached after nearly 1.5 years of litigation, extensive discovery, several dispositive motions, and an all-day mediation before Judge Andersen followed by additional investigation and negotiation. Class Counsel investigated this case through discovery, ultimately developing a sufficient record to successfully oppose Defendant's Motion for Summary Judgment and to successfully certify two classes. Throughout, the Parties were in strong disagreement on every aspect of this case, and these disagreements were expressed at a lengthy and contentious mediation. Indeed, the mediation did not immediately resolve the Parties' differences. It was not until several weeks later that the Parties were able to agree to the terms set forth in the Settlement, arriving at a number that Judge Anderson had indicated at the mediation that he believed would be fair to both sides. The Settlement was thus reached after arm's-length negotiations, and there was thus no collusion.

### C. <u>The Settlement is Fair, Reasonable, and Adequate.</u>

#### 1. The Settlement Provides Substantial Relief, Particularly in Light of the Uncertainty of Prevailing on the Merits and any Damages Award.

##### a. <u>Settlement Benefits</u>

The Settlement requires Defendant to pay $15,000,000, from which all approved claims will be paid *pro rata* after fees and costs. Settlement Agreement § 1.33. None of this money will revert to Defendant. On the claims rate here, claimants will receive approximately $97.53 each. This is an exceptional result for three main reasons.

First, it significantly exceeds the award in many other approved TCPA class action settlements. Recently, this Court granted final approval to a strong TCPA class settlement in which each claimant would be paid $89 on a 6.9% claims rate. *Ossola et al. v. American Express*

*Company, et al.*, Case No. 13-cv-4836 (N.D. Ill.) (Dkt. 368.). The Settlement here pays each claimant more than the *Ossola* settlement, despite a significantly higher claims rate (11.46%) and a virtually identical class size. The Settlement also meets or exceeds the relief in other TCPA settlements. *See, e.g., Wright v. Nationstar Mortg. LLC*, Case No. 14-cv-10457, 2016 U.S. Dist. LEXIS 115729 (N.D. Ill. Aug. 29, 2016) (finally approving settlement of $12.1m for a class of 2.3 million people, where each claimant would receive $45); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215 (N.D. Ill. 2016) (approving settlement that paid $52.50 to each claimant); *Malta v. Fed. Home Loan Mortg. Corp.,* No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) (preliminarily approving $17.1 million settlement to 5,887,508 class members; final approval granted at Dkt. No. 91).

Second, while the Settlement does not provide full statutory relief, this "does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *City of Detroit v. Grinnell*, 495 F.2d 448, 455 n.2 (2d Cir. 1974). This is particularly true here. While 47 U.S.C. § 227(b), the law on which the Prerecord Class' claim is based, mandates a *minimum* of $500 per call or text in violation of the statute, the DNC Class, which is significantly larger, bases its claim on 47 U.S.C. § 227(c), which allows for "up to $500 in damages." 47 U.S.C. § 227(c)(5)(B). The TCPA does not specify the factors to be considered in determining the appropriate amount of Section 227(c) damages, and there have been few cases analyzing this issue. What authority exists indicates that considerations include the severity or minimal nature of the violation; whether there was actual damage to the victim; the extent of any intrusion into the victim's privacy; and whether there was a reasonable purpose for the violation. *See, e.g.*, *Charvat v. NMP, LLC*, No. 2:09-CV-209, 2012 U.S. Dist. LEXIS 139505, at *10-11 (S.D. Ohio Sept. 27, 2012). Though it is certainly possible that a jury would have decided to award the

12

maximum damages, it is similarly possible that a jury would have found that Defendant's conduct was not particularly egregious and chose to award very nominal damages (in which case recovery would be less than what is provided for by this Settlement).

Third, this Settlement allows for real relief much sooner than would come in its absence. At the time the Parties agreed to settle, trial was approximately six months away. Even if that schedule were kept and Plaintiffs prevailed, the subsequent appeals would add years. While this is a compelling consideration in many cases, it is particularly compelling here. Defendant placed calls to people who had previously expressed interest in its cremation services, or who Defendant believed would be interested in Defendant's cremation services. There is thus likely to be a larger population of terminally sick and/or elderly in the Classes than in the typical TCPA class action, and these persons may not have the luxury of waiting years for a resolution. Indeed, Class Counsel has heard from Members whose loved ones were the target of Defendant's calls, but who have since passed away.

The Settlement also provides for meaningful prospective relief. Defendant has agreed to implement do not call policies and procedures to ensure that, going forward, do not call requests are properly honored and all of its telemarketing calls comply with the TCPA. The Settlement also requires Defendant to mark as "do not call" all persons who it currently has marked as "DECEASED", preventing future instances of calls to persons (or the family of persons) who have passed away.

b. Strength of Plaintiffs' Case

Plaintiffs believe their case is strong on liability. Plaintiff Allard survived a Motion for Summary Judgment (in which Defendant raised many of its defenses that it would raise on a class-wide basis) and the court in the Allard Matter granted Plaintiff Allard's Motion for Class

13

Certification.

Liability, however, is only part of the equation. The Parties do not dispute that everyone to whom Defendant placed calls had provided Defendant their contact information. While some persons, such as Plaintiffs, asked Defendant to stop calling, others did not, and it is unclear (and impossible to tell) from the records who else may have done so. It can be reasonably assumed that many persons wanted, and were pleased to receive, the calls for which they are now receiving compensation. Such individualized issues may present Defendant with a colorable argument for decertification of the classes. *See, e.g., Christopher Legg et al. v. PTZ Insurance Agency LTD, et al.,* Case No. 14-C-10043 (N.D. Ill. Aug. 15, 2017) (declining to certify class where there was evidence that many putative class members consented to receive the calls at issue, leading to individualized questions of standing under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)). Moreover, while Plaintiffs continue to believe – and Judge Drain appeared to agree – that consent is not relevant to standing or liability, it may nonetheless have proved relevant to damages. It is possible that a jury would adopt Defendant's inevitable position that while it may have broken the law, it did so inadvertently, on a technicality, and there was no real harm to justify anything more than nominal damages.

Even if a jury were to award significant damages, any such award also runs the risk of being reduced on due process grounds. In fact, recently, a Court awarded $10 per call on a claim under 47 U.S.C. § 227(b), which does not appear to, on its face, leave discretion for any reduction from $500 per call. *Golan v. Veritas Entm't, LLC*, Case No. 14-cv-00069, 2017 U.S. Dist. LEXIS 144501 (E.D. Mo. Sept. 7, 2017). This reduced damages from potentially $1.6b to $32m. While Plaintiffs disagree with this ruling, it is nonetheless a possibility as damage numbers begin to grow exceptionally large. This is even more of a possibility for any damages

14

awarded pursuant to 227(c), in which the "up to" language would seem to leave room for such a reduction.

Were this case to continue, there was also a risk of decertification. While Judge Drain granted Plaintiffs' Motion for Class Certification, it was not clear that Judge Drain would ultimately hear an inevitable Motion for Decertification. On July 13, 2017, President Trump nominated two individuals to fill the two vacancies in the Middle District of Tennessee. One of these individuals, Judge William L. Campbell Jr., was seated quickly, receiving his judicial commission on January 12, 2018. Given the judicial emergency, it is likely that the other pending nomination will receive his commission shortly. This case likely would have been re-assigned to one of those newly confirmed judges, who would have heard any Motion for Decertification. Defendant has also raised colorable arguments in favor of decertification related to whether individual class members suffered harm sufficient to confer Article III standing and the damages calculation under the "up to" language of 47 U.S.C § 227(c).

Finally, there is always the risk of outright losing a jury trial, or losing an appeal.

## 2. Continued Litigation is Not in the Best Interests of Plaintiffs or Members of the Classes.

As discussed, because of the nature of the claims, there is likely to be a larger population of sick and/or elderly persons in the Classes than in the typical TCPA class action, and these persons may not have the luxury of waiting years for a resolution. Continued litigation would only serve to delay recovery to those who literally cannot wait. Further, there is no guarantee of recovery better than that provided for in the Settlement. With motions for summary judgment, to decertify, *in limine*, and trial and appeals on the horizon, there are many ways this case could have gone wrong for Plaintiffs and members of the Classes. Even if Plaintiffs were to prevail at

every step of the way, such unqualified success would have taken years, and it is unclear whether there would be any material benefit given the discretionary damages underlying the bulk of claims. It is a genuine possibility that the Classes would have received less at trial than what this Settlement offers. The Settlement allows for definite relief and it will give more persons the opportunity to receive it than would be the case were the Parties to continue to litigate. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### 3. The Response to the Settlement is Overwhelmingly Positive, and There Have Been No Objections.

There has been no opposition to the Settlement. To the contrary, the response to the Settlement has been excellent, as evidenced by the 11.46% claims rate, the extremely low opt-out rate of 0.0049% (39 timely opt outs), and lack of objections. Furthermore, in almost all interactions Class Counsel has had with Class Members, the Class Member has expressed strong support of – and even excitement about – the Settlement. For example, on November 18, 2017, Class Counsel received an email from a Class Member and former law professor, which stated, in part, "I don't often get excited about class actions – I am about yours." Declaration of Jeremy M. Glapion, ¶ 14. The sentiment in Class Member phone calls to Class Counsel has been similar.[9] *Id.* at 15.

---

[9] One Class Member wrote a letter to the Court which, was docketed on December 7, 2017 [Dkt. 31], expressing some confusion about how to fill out the detachable claim form. Class Counsel acted promptly on this Class Member's concerns – even going so far as to authorize supplemental notice to the class to address the concerns raised. This Class Member subsequently emailed Class Counsel to express his satisfaction with the Settlement, calling Class Counsel a "credit to [the legal] profession". This Class Member further confirmed that he does not intend for his letter to serve as any sort of ongoing objection to the Settlement, writing to Class Counsel that "[m]y…inquiry has been satisfactorily addressed and the remedies are fine. It's all good with me and I hope you prevail in court." Exhibit C.

### 4. Class Counsel Endorses the Settlement.

Class Counsel strongly believes this Settlement is exceptional. As set forth above, eligible claimants will receive approximately $97.53, which is real and meaningful compensation. Further, Defendant's implementation of certain policies and procedures to ensure future compliance with the TCPA will benefit Class Members and non-Class Members alike, including the loved ones of Class Members.

### 5. Stage of the Proceedings and Amount of Discovery Completed.

As mentioned, Plaintiffs served five sets of requests for production, four sets of interrogatories, and three sets of requests for admission in the 14 months of discovery in this matter. Defendant served written discovery on Plaintiff Allard and took Plaintiff Allard's deposition. While Discovery was set to officially conclude on October 10, 2017, by the time the Parties agreed to the terms of the Settlement, the bulk of discovery had been completed, and trial prep was set to begin. Trial was scheduled for February 6, 2018.

The case also saw significant, meaningful, and dispositive motion practice prior to Settlement. On January 31, 2017, Defendant moved for summary judgment on Plaintiff Allard's individual claims. Plaintiff opposed and Defendant replied. On May 5, 2017, Plaintiff Allard filed her Motion for Class Certification. Defendant opposed and Plaintiff replied. Had the Court ruled in Defendant's favor on either Motion, the case would have effectively ended. On July 10, 2017, the Court denied Defendant's Motion for Summary Judgment. On July 31, 2017, the Court granted Plaintiff's Motion for Class Certification. An unfavorable decision for Plaintiffs on either Motion would have effectively ended the case and left Class Members with no relief.

## IV. CONCLUSION

Plaintiff respectfully requests that the Court 1) finally approve the proposed Settlement,

2) finally certify the proposed Classes for settlement purposes; 3) finally approve a service award to Plaintiff Allard of $10,000 and Plaintiff Strache of $7,000, and 4) finally approve Class Counsel's request for $4,917,979.45 in costs and fees.

Dated: February 28, 2018
/s/ Jeremy M. Glapion
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com

18